**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PSINet, Incorporated;
Charlottesville Sexual Health &
Wellness Clinic; Portico
Publications, Ltd., Publisher of
Charlottesville Weekly; Silverchair
Science Communications,
Incorporated; Virginia ISP
Alliance; Rockbridge Global
Village; American Booksellers
Foundation for Free Expression;
The Periodical and Book
Association of America,
Incorporated; Freedom to Read
Foundation; Sexual Health
Network; Chris Filkins, Proprietor
of the Safer Sex Institute; Harlan
Ellison; The Comic Book Legal
Defense Fund; Susie Bright; A
Different Light Bookstores;
Lambda Rising Bookstores;
Bibliobytes; People for the
American Way,

      *Plaintiffs-Appellees,*

    and

United States Internet Service
Provider Association,

        *Plaintiff,*

    v.

No. 01-2352

Warren D. Chapman,
Commonwealth Attorney; James L.
Cambloss, III, Commonwealth
Attorney,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CA-99-111-3)

Argued: October 28, 2002

Decided: March 25, 2004

Before NIEMEYER, Circuit Judge,
James R. SPENCER, United States District Judge for the
Eastern District of Virginia, sitting by designation, and
Andre M. DAVIS, United States District Judge for the
District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Spencer wrote the opinion. Judge Davis wrote a concurring opinion. Judge Niemeyer wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** William Henry Hurd, State Solicitor, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Thomas W. Kirby, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Jerry W. Kilgore, Attorney General of Virginia, Alison P. Landry, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for

Appellants. Garrett M. Smith, MICHIE, HAMLETT, LOWRY, RAS-
MUSSEN & TWEEL, P.C., Charlottesville, Virginia; Michael A.
Bamberger, SONNENSCHEIN, NATH & ROSENTHAL, New York,
New York; Elliot M. Mincberg, Lawrence S. Ottinger, PEOPLE FOR
THE AMERICAN WAY FOUNDATION, Washington, D.C.; Robert
M. O'Neil, J. Joshua Wheeler, THE THOMAS JEFFERSON CEN-
TER FOR THE PROTECTION OF FREE EXPRESSION, Char-
lottesville, Virginia, for Appellees.

## OPINION

SPENCER, District Judge:

This matter is before the Court on the Defendants' appeal of the
Western District of Virginia's grant of Summary Judgment in favor
of the Plaintiffs. At issue is the constitutionality of Va. Code Ann.
Section 18.2-391 (Michie Supp. 1999) (amended 2000), which crimi-
nalizes the dissemination of material harmful to minors over the Inter-
net. The District Court found the statute invalid under both the First
Amendment and the Commerce Clause. For the reasons discussed
below, the District Court's ruling granting summary judgment and
striking down the statute is AFFIRMED.

## I.   Background

Plaintiffs represent a spectrum of businesses, membership organi-
zations, and individuals who use the Internet[1] to communicate, dis-
play, and to seek access to a broad range of speech. Plaintiffs
communicate online both within and from outside the Commonwealth
of Virginia, and Plaintiffs' speech is accessible both within and out-

---

[1]We do not recite here the specifics of how the Internet functions;
where necessary, we describe any relevant features of the Internet in our
analysis of this case. We note that the general contours of the Internet
have been described in various other judicial opinions. *See Reno v.
ACLU*, 521 U.S. 844, 849-57 (1997); *Cyberspace, Communications, Inc.
v. Engler*, 55 F. Supp. 2d 737, 740-44 (E.D. Mich. 1999); *American
Libraries Ass'n. v. Pataki*, 969 F. Supp. 160, 164-67 (S.D.N.Y. 1997);
*Shea v. Reno*, 930 F. Supp. 916, 925-34 (S.D.N.Y. 1996).

side of Virginia. Plaintiffs all fear that their online speech could be considered "harmful to juveniles" in some communities under Virginia Code section 18.2-391, despite the fact that their speech may receive full constitutional protection as to adults. Plaintiffs facially challenged the constitutionality of section 18.2-391 and were granted a permanent injunction by the United States District Court for the Western District of Virginia enjoining the enforcement of the statute.

Since 1970, Virginia has prohibited the knowing display in "brick and mortar" space, of commercial materials that are harmful to juveniles. Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000). In 1985, Virginia amended the statute, making it also unlawful "to knowingly display" these materials "in a manner whereby juveniles may examine and peruse" them. 1985 Va. Acts, ch. 506. Several plaintiffs brought suit challenging the 1985 amendment as facially unconstitutional on the grounds that it was impermissibly vague and violated the First Amendment. After a tortuous path through the courts, the statute was eventually upheld by the Fourth Circuit in light of a narrowing construction accorded to the statute by the Supreme Court of Virginia. *American Booksellers Ass'n v. Virginia*, 882 F.2d 125, 126 (4th Cir. 1989).

The statute was reenacted as amended in 1999 to include electronic files or messages, and was again reenacted as amended in 2000. The statute in its present form makes it unlawful to "sell, rent or loan to a juvenile" or to knowingly display for commercial purposes in a manner whereby juveniles may examine and peruse:

> 1.  Any picture, photography, drawing, sculpture, motion picture film, electronic file or message containing an image, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or

> 2.  Any book, pamphlet, magazine, printed matter however reproduced, electronic file or message containing words, or sound recording which contains any matter enumerated in subdivision 1 of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement,

sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.

Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000) (emphasis added). A violation of section 18.2-391 is a Class I misdemeanor.

The 2000 Amendment adds the following:

[I]f a person uses services of an Internet service provider or an electronic mail service provider in committing acts prohibited under this subsection, such Internet service provider or electronic mail service provider shall not be held responsible for violating this subsection.

Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000). The amendment creates a defense for Internet service providers (ISPs) and email service providers when a person violating the statute uses an ISP or email service provider as the medium through which to disseminate prohibited material. The ISP or email service provider, however, would be liable if it disseminated the material itself as opposed to serving as the gateway through which the material passes.

In relation to the statute, Virginia Code section 18.2-390(6), defines the term "harmful to juveniles" as:

that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it

(a) predominately appeals to the prurient, shameful or morbid interest of juveniles,

(b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and

(c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

Section 18.2-390(7) defines "knowingly" as:

> having general knowledge of, or reason to know, or a belief
> or ground for belief which warrants further inspection or
> inquiry of both (a) the character and content of any material
> described herein which is reasonably susceptible of exami-
> nation by the defendant, and (b) the age of the juvenile, pro-
> vided, however, that an honest mistake shall constitute an
> excuse from liability hereunder if the defendant made a rea-
> sonable bona fide attempt to ascertain the true age of such
> juvenile.

The relevant "community" whose standards govern what is harmful
is undefined, as is "commercial purpose."

Plaintiffs filed their Complaint and Motion for Preliminary Injunc-
tion in the United States District Court for the Western District of Vir-
ginia in December of 1999. The Honorable James H. Michael, Jr.,
United States District Court Judge, granted Plaintiffs' Motion for Pre-
liminary Injunction by Order and Memorandum Opinion on August
10, 2000. Plaintiffs then filed a Motion for Summary Judgment Grant-
ing Final Injunction, which the District Court granted on October 11,
2001. The Commonwealth appealed the summary judgment decision.

This Court accepted the appeal and oral arguments were scheduled
on October 28, 2002. On January 21, 2003, this Court certified the
following questions of law to the Supreme Court of Virginia:

> A.   Would the use of any of the technological access con-
> trols identified by the Attorney General of Virginia preclude
> conviction under Virginia Code § 18.2-391 as amended in
> 1999?
>
> B.   Does the prohibition against knowingly displaying por-
> nographic materials that are "harmful to juveniles" apply to
> displays made only in connection with the sale, rental, or
> loan of such materials? If not, what must the government
> establish to prove that a defendant has knowingly displayed
> such material "for commercial purpose"?

*PSINet, Inc. v. Chapman*, 317 F.3d 413, 419 (4th Cir. 2003). On September 12, 2003 the Supreme Court of Virginia advised this Court that pursuant to Rule 5:42 it would not furnish answers to the certified questions because the answers would not be outcome determinative.

The Commonwealth argues two issues on appeal. First, that *American Booksellers* is binding precedent in this case and therefore, the statute should not be subject to another facial challenge. Second, that the District Court erred in granting Plaintiffs' Motion for Summary Judgment and request for Final Injunction. Because we find that a facial challenge to the statute is appropriate given the facts of this case and that Plaintiffs were entitled to summary judgment and a final injunction, we AFFIRM the District Court's ruling.

## II.   Analysis

### A.   Plaintiffs' Facial Challenge

The Commonwealth argues that the 1999 Act did not enlarge the scope of section 18.2-391 and that this Court's binding precedent in *American Booksellers*, precludes another facial challenge. The pre-1999 version of the statute, which did not explicitly reference electronic materials, contained two "catch-all" provisions. In reference to harmful print materials, explicitly including books, pamphlets, etc., the statute included the catch-all provision "however reproduced." In reference to harmful representational materials, the statute included the catch-all provision "or similar visual representation or image." According to the Commonwealth, electronic materials, both print and representational, fit comfortably within these two catch-all provisions and the 1999 amendment merely explicitly included electronic materials that were already implicitly encompassed by the statute.

The Commonwealth's arguments, however, are misguided. We agree with the District Court that a reading of section 18.2-391 illustrates that the catch-all phrases do not cover Internet material. It is disingenuous for the Commonwealth to argue that when the 1985 version of the statute was adopted the Virginia legislature intended to regulate the vast Internet material of today. Especially given that the legislature felt compelled to amend the Act in 1999 to include "elec-

tronic file[s] or message[s] containing words . . . and . . . images." Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000).

General principles of statutory construction require a court to construe all parts to have meaning and to reject constructions that render a term redundant. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (where the Supreme Court explained that a court is "obliged to give effect, if possible, to every word"); *Platt v. Union Pacific R.R. Co.*, 99 U.S. 48, 58-59 (1878) (if a construction renders a term redundant, that is a reason for rejecting that construction); *Virginia v. Browner*, 80 F.3d 869, 877 (4th Cir. 1996) (a court should not "construe a statute in a manner that reduces some of its terms to mere surplusage"); *United States v. Snider*, 502 F.2d 645, 652 (4th Cir. 1974) (all parts of a statute must be construed so that each part has meaning); *McLean Bank v. Nelson*, 232 Va. 420, 427, 350 S.E.2d 651, 656 (1986) (Virginia statutory interpretation requires that all words of a statute be given meaning where possible). The Virginia legislature's decision to amend section 18.2-391 to include electronic communications was not a redundant act simply including an area already covered by the Act, but was an affirmative step making the Act applicable to Internet communication. Thus the amendment was clearly a purposeful extension of the Act to a new area of communication, and Plaintiffs may facially challenge the Acts constitutionality as reenacted.

Furthermore, this Court's decision in *American Booksellers* does not preclude Plaintiffs' facial challenge. In *American Booksellers v. Virginia*, 882 F.2d 125 (4th Cir. 1989) this Court only considered whether non-obscene adult materials could be displayed and sold to adults in stores so long as sellers did not "knowingly afford [ ] juveniles an opportunity to peruse harmful materials." *Id.* at 127. After the Supreme Court of the United States certified questions to the Supreme Court of Virginia, this Court concluded that the 1985 Act merely required booksellers to segregate a few works onto a shelf located where bookstore personnel would notice inappropriate juvenile interest while carrying out their regular duties. *See id.* at 127.

Moreover, this Court's First Amendment analysis in *American Booksellers* dealt with traditional bookstores at physical locations and does not apply to the "unique and wholly new medium of worldwide

human communication" that is the Internet. *Reno*, 521 U.S. at 850. Nor does selling adult books and magazines in a fixed location raise the Commerce Clause concerns that state regulation of the Internet raises. *See* Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 824 (2001).

One facial challenge of a statute does not preclude another challenge of an amended statute on different grounds. Plaintiffs were permitted to bring a facial challenge of Virginia Code section 18.2-391 (Michie Supp. 1999) as amended and the District Court's decision enjoining section 18.2-391 was proper.

## B.  *The District Court's Grant of Summary Judgment*

On October 11, 2001, the District Court granted Plaintiffs' Motion for Summary Judgment and entered a Final Injunction against the enforcement of section 18.2-391. A motion for summary judgment should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts and reasonable inferences must be interpreted in the light most favorable to the non-moving party. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990). However, summary judgment is appropriate "where the facts and the law will reasonably support only one conclusion." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)(quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)). This Court reviews the grant or denial of summary judgment de novo. *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994). In that the undisputed material facts and law reasonably support only one conclusion in the case at hand, we AFFIRM the District Court's grant of summary judgment.

### 1.  *First Amendment Analysis*

The District Court held that in seeking to restrict the access of minors to indecent material on the Internet, section 18.2-391 imposes an unconstitutional burden on protected adult speech. As a content-based restriction on expression, the statute may only be upheld if it survives strict scrutiny. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) (applying strict scrutiny to a law

restricting explicit programming); *Reno I*, 521 U.S. at 870 (applying strict scrutiny to regulation of Internet speech). Strict scrutiny requires the law in question to be 1) narrowly tailored to 2) promote a compelling government interest. *Playboy*, 529 U.S. at 813.

The government has the burden of showing that a content-based regulation of speech "is necessary to serve a compelling state interest." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 786, 788-89 (1978). It is clear that the government's interest in protecting minors from sexually explicit Internet materials is compelling. *See Ginsberg v. New York*, 390 U.S. 629, 639 (1968) (recognizing New York's compelling interest in limiting the availability of sexual material to minors); *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978) (recognizing the government's interest in limiting the broadcast of offensive words dealing with sex that was accessible to children). The question then becomes whether the Act is narrowly tailored so that it may pass strict scrutiny.

Both sides concede that the 1999 Act is not narrowly tailored if it effects a total ban on the display of all "electronic file[s] or message[s]," containing "harmful" words, images or sound recordings, that juveniles may "examine and peruse," as the plain language of the statute seems to indicate. *See* Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000). To save the statute from unconstitutionality the Commonwealth proposes certain statutory interpretations. However, even with the Commonwealth's creative constructions, the statute remains unconstitutionally overbroad or becomes impotent and thus unconstitutional under the First Amendment.

The Constitution provides significant protection "from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). Under the doctrine of overbreadth, a statute violates the First Amendment if it prohibits a substantial amount of protected expression. *Id.* In that section 18.2-391 penalizes a substantial amount of speech that is constitutionally protected, it violates the First Amendment.

Several courts have struck down general bans and blanket restrictions on Internet speech deemed harmful to juveniles as unconstitu-

tionally overbroad. The Commonwealth suggests that we interpret section 18.2-391 as regulating only Internet speech occurring within the Commonwealth of Virginia. However, other statutes with that same geographic restriction have been struck down as impermissibly chilling to protected speech. *See generally, American Libraries Ass'n. v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997). Attempting to localize Internet regulation is extremely problematic because the Internet "by its nature has no local areas." Charles Nesson & David Marglin, *The Day the Internet Met the First Amendment: Time and the Communications Decency Act*, 10 Harv. J.L. & Tech. 113, 131 (1996).

Other courts have explained that:

> [A]n Internet user cannot foreclose access to her work from certain states or send differing versions of her communication to different jurisdictions. In this sense, the Internet user is in a worse position than the truck driver or train engineer who can steer around Illinois or Arizona, or change the mudguard or train configuration at the state line; the Internet user has no ability to bypass any particular state. The user must thus comply with the regulation imposed by the state with the most stringent standard or forego Internet communication of the message that might or might not subject her to prosecution.

*Pataki*, 969 F. Supp. at 183. In fact, based on the pleadings of the parties and the findings of other federal courts, the District Court found that for "most communications over the Internet, the speaker has little or no effective control over whether minors or adults are able to gain access to his communications." Dist. Ct. Op. J.A. at 298 (citing *Reno*, 521 U.S. at 855-56). The District Court found that "speakers who publish on the Web generally make their materials publicly available to users around the world, regardless of age, and lack any practical or reliable means for preventing minors from gaining access to the information on their sites or for verifying the true age of users of their Web sites." *Id*. The District Court went further to explain that the Internet is:

> [W]holly insensitive to geographic distinctions, and Internet protocols were designed to ignore rather than to document

> geographic location. While computers on the Internet do have "addresses," they are addresses on the network rather than geographic addresses in real space. Most Internet addresses contain no geographic information at all. An Internet user who posts a Web page in one state cannot readily prevent residents of other states from viewing that page, or even discern in which state visitors to the site reside.

Dist. Ct. Op. J.A. at 298 (citing *Pataki*, 969 F. Supp. at 170). In that Internet speakers have no way of preventing Virginia juveniles from accessing their Internet speech, the "severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno*, 521 U.S. at 872. In an attempt to deny minors access to potentially harmful speech, section 18.2-391 will "effectively suppress[ ] a large amount of speech that adults have a constitutional right to receive and to address to one another." *Id*. at 874. Individuals who wish to communicate images that might fall within the statute's proscriptions must thus self-censor or risk prosecution. It is this type of regulation, of otherwise protected speech, that other courts have consistently struck down as unconstitutional.

The Commonwealth asks the Court to read other propositions into section 18.3-391 under the guise of narrowing constructions. The Commonwealth suggests that section 18.2-391 be read as providing a defense when a Web site requires an adult PIN number for access.

Under the Commonwealth's construction of section 18.2-391, a Web site employing a security screen requiring an adult PIN will be immune from prosecution. These PINs can be obtained through adult PIN registration services online, or the Web site could distribute PINs itself. An adult would obtain a PIN by providing a credit card number to the service.[2] Dist. Ct. Op. J.A. at 13-14.

---

[2] It is assumed only adults will have credit cards because only adults are contractually obligated to pay back credit card charges. *But see*, *Reno*, 521 U.S. at 881-82 (where the Supreme Court questioned the validity of a PIN number defense because the appellants failed to establish that a PIN number system would adequately screen out juveniles).

The Commonwealth argues that an affirmative defense for PIN numbers must be read into section 18.2-391 in light of the Supreme Court of Virginia's previous narrowing construction in *Commonwealth v. American Booksellers Ass'n.*, 236 Va. 168, 178, 372 S.E.2d 618, 624-25 (1988). The Supreme Court of Virginia explained that to prove a violation under section 18.2-391, in the context of a physical bookstore, "the Commonwealth would have the burden of proving beyond a reasonable doubt that the defendant bookseller knowingly afforded juveniles an opportunity to peruse harmful materials, or took no reasonable steps to prevent such perusal when the juvenile's opportunity was reasonably apparent to the bookseller." *Id.* (emphasis in original). The Commonwealth is persuaded and urges upon the Court that the language, "reasonable steps to prevent such perusal," in the 1988 *American Booksellers* decision should be construed as allowing an affirmative PIN number defense to the 1999 amendment of the Act.

The general principle is that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). However, only if a statute is "readily susceptible" to a narrowing construction will the court apply such a construction to save an otherwise unconstitutional law. *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988). The Supreme Court has explained that narrowing constructions are only appropriate when "the text or other source of congressional intent" identifies a clear line that a court could draw. *Reno*, 521 U.S. at 884. Courts must be careful not to invade upon the legislative domain and a court should never "rewrite a law to conform it to constitutional requirements." *See Reno*, 521 U.S. at 884-85.

The Commonwealth's PIN number defense is not "readily susceptible" from the text or any other source of congressional intent. Such a reading adding an affirmative PIN number defense might be possible if not for the Virginia legislature's decision to explicitly state the defenses applicable to section 18.2-391. In 2000, just one year after it enacted the language making section 18.2-391 applicable to Internet communication, the Virginia legislature went back and amended section 18.2-391 to explicitly add the one defense that it intended to include. The 2000 amendment limits the liability of ISPs and email

service providers who simply serve as a medium through which an offender disseminates prohibited material, but says nothing regarding the liability of commercial Web sites that use PIN numbers. Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000).

Furthermore, using the Supreme Court of Virginia's language in *American Booksellers*, there is no indication that the use of a PIN number would be considered a "reasonable step" to prevent "reasonably apparent" perusal by juveniles. As the Plaintiffs have previously pointed out, the Commonwealth would certainly not agree that a liquor or tobacco store that sold to anyone with a valid credit card number, without some additional step to ascertain the age of the customer, was taking reasonable steps to exclude juveniles from the purchase of age prohibitive products. Other courts have questioned both the reasonableness and effectiveness of credit card verification, and there is no indication that the Virginia legislature intended to adopt PIN number verifications as an affirmative defense to section 18.2-391. This Court has no authority to include an affirmative defense to section 18.2-391 where the Virginia legislature has given no indication (explicit or implicit) that it intended to include said defense.

Finally, the Commonwealth's PIN number solution to the statute's First Amendment problems creates First Amendment problems of its own. The District Court explained that the stigma associated with the content of these Internet sites may deter adults from visiting them if they cannot do so without the assurance of anonymity. The Court pointed out that many adults may be unwilling to provide their credit card number online, and would therefore not visit the site. Such a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card. Such requirements would unduly burden protected speech in violation of the First Amendment.[3]

---

[3]The dissent cites to *Ashcroft v. ACLU*, 535 U.S. 564, 583 n. 14 (2002), for the proposition that the Supreme Court has recognized "adult identification screens" as a feasible Internet alternative. The Court in *Ashcroft*, however, focused exclusively on the use of "community standards" to screen "obscene" Internet speech, an area that falls outside the purview of the First Amendment. The Court in *Ashcroft* explicitly stated that it did not "express any view" as to whether the Child Online Protection Act, and its use of adult identification screens, would survive a strict scrutiny analysis. *Ashcroft*, 535 U.S. at 585-86.

The District Court was correct in its conclusion that requiring adult Web sites to utilize PIN numbers would unconstitutionally chill free speech. In that the Commonwealth's proposed construction would still render section 18.2-391 unconstitutional under the First Amendment, it would make no sense for this Court to adopt that construction.

The Commonwealth also asks this Court to construe section 18.2-391 in a manner that would virtually exempt bulletin boards and chat rooms from its regulations. The Commonwealth correctly points out that the 2000 amendment to section 18.2-391 limits the liability of service providers who do nothing more than set up the Internet chat room or bulletin board. *See* Va. Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000). The amendment does not, however, exempt the speakers who post material in chat rooms and on bulletin boards.

The Commonwealth admits that individual speakers who post messages in chat rooms or on bulletin boards for "commercial purposes" will still be subject to regulation under section 18.2-391. The Commonwealth seems to suggest that the number of Internet users engaged in this type of speech is so small that a ban on this commercial speech in these forums is permissible.[4] However, the number of individuals engaged in a particular type of speech is not determinative of whether First Amendment protections must be afforded to that type of speech.

As the District Court pointed out, participants in online chat rooms and discussion groups have no way to tell when participants from another state join the conversation or whether that participant is a minor. Dist. Ct. Op. J.A. at 299. As such, speakers could never engage in commercial adult speech in these types of forums without subjecting themselves to the possibility of criminal liability. In essence, speech that receives complete protection as to adults could never be engaged in unless the particular chat room or bulletin board completely banned juveniles.[5] Furthermore, banning juveniles from

_____

[4]The Commonwealth makes this argument in spite of the fact that the term speech for "commercial purposes" remains undefined by section 18.2-391.

[5]The Commonwealth has been unable to suggest any equivalent to the adult verification measures currently available to commercial Web site operators that could be utilized by individuals wishing to engage in protected commercial speech in chat rooms or on bulletin boards.

these particular formats would prevent them from accessing the beneficial materials, *i.e.* non-sexually explicit materials, they contain. By the Commonwealth's own admission, section 18.2-391 cannot be construed in a way that completely exempts chat rooms and bulletin boards. The blanket prohibition of adult commercial speech that the statute imposes violates the First Amendment.

Even if the Court completely construed section 18.2-391 in the manner that the Commonwealth requests, such a construction would leave the Act virtually powerless. When the government defends a regulation of speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994) (*quoting Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 (D.C. Cir. 1985)). "It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 624; *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)(explaining that the burden is on the party seeking to uphold a restriction on commercial speech to "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496 (1986) (explaining that a "[c]ourt may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity"). Where strict scrutiny applies, a statute that "leaves appreciable damage to th[e] supposedly [compelling] interest" uncorrected is invalid. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (internal citations omitted). Even commercial speech regulation "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).

In order to avoid being too burdensome on protected speech, the statute cannot, by the Commonwealth's own admission, protect Virginia juveniles from foreign or out-of-state Internet materials, regulate non-commercial Internet materials, or regulate materials posted on bulletin boards or in chat rooms. Given the nature of the Internet, such a construction would leave section 18.2-391 virtually powerless. In

the District Court's findings, it explained that "Communications on the Internet do not 'invade' an individual's home or appear on one's computer screen unbidden. Rather, the receipt of information 'requires a series of affirmative steps more deliberate and directed than merely turning a dial.'" Dist. Ct. Op. J.A. at 296 (quoting *Reno*, 521 U.S. at 854). As the District Court noted at oral argument, there is no benefit to a law which merely reduces the number of pornographic responses to an Internet search by a juvenile from 186,000 responses to 183,000 responses (hypothetically). J.A. at 908.

There is no indication that technology exists to track Web sites or Web site users in a manner that would give section 18.2-391 any bite. There is also no indication that a significant amount of harmful material available to juveniles in Virginia originates within the Commonwealth or comes from individuals who would be subject to the Commonwealth's jurisdiction.[6] Furthermore, section 18.2-391 only regulates commercial Web sites, leaving a significant number of equally harmful, non-commercial Web sites, that could be screened by current Internet filtering technology, un-regulated. *See* J.A. at 447.

In essence, the Commonwealth has failed to demonstrate in any way that section 18.2-391 passes Constitutional muster. Using the plain language of section 18.2-391 and banning the display of all "electronic file[s] or message[s]," containing "harmful" words, images or sound recordings, that juveniles may "examine and peruse," is not a narrowly tailored solution and is unconstitutionally overbroad. On the other hand, using the proposed narrowing constructions renders section 18.2-391 powerless and therefore constitutes an impermissible regulation of speech under the First Amendment. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Under either approach, section 18.2-391 unconstitutionally chills free speech and therefore violates the First Amendment.

---

[6]*See ACLU v. Reno*, 929 F. Supp. 824, 882-83 (E.D. Pa. 1996) (explaining that "[n]early half of Internet communications originate outside the United States, and some percentage of that figure represents pornography," and that "[p]ornography from, say, Amsterdam will be no less appealing to a child on the Internet than pornography from New York City, and residents of Amsterdam have little incentive to comply with the CDA.")

*2.  Commerce Clause Analysis*

Not only may the District Court's decision be upheld based on section 18.2-391's violation of the First Amendment, the decision may be upheld on the separate ground that the statute violates the Commerce Clause. The negative implication of the Commerce Clause (the Dormant Commerce Clause), U.S. Const. Art. I., § 8, cl. 3, includes a prohibition on state regulation that "discriminates against or unduly burdens interstate commerce and thereby imped[es] free private trade in the national marketplace." *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980)). Several courts have struck down state statutes similar to Virginia Code section 18.2-391 as unduly burdensome on interstate commerce because they, in effect, restrict commercial electronic materials in all states, not just the state in which the statute was enacted. For example, in *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997), the District Court found that because there was no effective way to limit access to online materials by geographic location, a Web site owner operating legally in California would have to comply with New York's law to avoid being subject to liability there. *Id.* at 174. This may deter the California Web site from placing its material on the Internet, thereby affecting legitimate commerce outside of New York. At the least, the California Web site would have to incur the expense of complying with New York's law if it were willing to post the materials at all (because materials accessible online in California are equally accessible online in New York).

Adopting the rationale of *Pataki*, the District Court rejected the Commonwealth's arguments and analyzed section 18.2-391 as a direct regulation of interstate commerce. The Commonwealth attacks the conclusion reached by the District Court and argues that the statute should be construed narrowly to comply with the Dormant Commerce Clause. The Commonwealth argues that it should "be presumed . . . that a legislative body . . . did not intend to give its enactments an impermissible extra-territorial operation." 82 C.J.S. *Statutes* § 310. The Commonwealth argues that the statute must be read not to have an impermissible effect unless the language of the statute makes such a reading impossible. *See Planned Parenthood v. Camblos*, 155 F.3d 352, 383 (1998).

The Commonwealth asserts that through such a narrow construction the statute would not govern the "broad array of out-of-state Web sites" that have no contact with Virginia "other than being accessible here." The logical conclusion of this argument is that the statute would only govern Web sites based in-state or Web sites with some other form of sufficient contacts with Virginia more substantial than merely being accessible here. The Commonwealth does not specify what those types of contacts might be.

As the District Court pointed out, the nature of the Internet itself makes the Commonwealth's proposed construction nearly impossible. "The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed." *Pataki*, 969 F. Supp. at 168. Given the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material, such as section 18.2-391, can be construed to have only a local effect. *See Reno*, 521 U.S. at 887-95 (Justice O'Connor, concurring in part and dissenting in part) (discussing the difficulty in applying principles of zoning law to the Internet).

However, even if the Commonwealth's limiting construction were applied, the Act would nonetheless be an invalid indirect regulation of interstate commerce because the burdens it imposes on interstate commerce are excessive in relation to the local benefits it confers. In *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), the Supreme Court set forth the balancing test applicable to indirect regulations of interstate commerce. The two-fold inquiry first looks at the legitimacy of the state's interest and secondly weighs the burden on interstate commerce in light of the local benefit derived from the statute. *Pike*, 397 U.S. at 142. There is no question that Virginia has a compelling interest in protecting the physical and psychological well-being of minors. The local benefits of such a statute, however, have not been proven.

By construing the Act so that it only reaches intrastate communication, the Commonwealth again finds itself in the same conundrum as it did in its First Amendment analysis. If the Commonwealth is capable of limiting its Internet regulation as not to directly offend the Commerce Clause, then it will have no local benefit given the vast

number of other communication options available to a juvenile seeking them.

Even if section 18.2-391 can be construed in a manner that does not directly violate the Commerce Clause, the statute still fails under the Dormant Commerce Clause analysis of *Pike v. Bruce Church*. The District Court was correct in granting Plaintiffs' Motion for Summary Judgment because section 18.2-391 violates the Commerce Clause.

### III.   Conclusion

The content of the Internet is analagous to the content of the night sky. One state simply cannot block a constellation from the view of its own citizens without blocking or affecting the view of the citizens of other states. Unlike sexually explicit materials disseminated in brick and mortar space, electronic materials are not distributed piecemeal. The Internet uniformly and simultaneously distributes its content worldwide. As the District Court noted, there may some day be sufficient technology to render this statute constitutional. However, in light of current technology, the statute cannot be reasonably construed to meet both First Amendment and Commerce Clause challenges. The District Court was correct in granting Plaintiffs' Motion for Summary Judgment and granting a permanent injunction against section 18.2-391. Therefore, the District Court's decision is hereby

*AFFIRMED.*

DAVIS, District Judge, concurring:

Indubitably, as all agree, government has a compelling interest in protecting children from harm. Were I participating in this case as the doting grandfather that I am proud to be, I would eagerly embrace the result reached by the dissent. Shedding my familial role, however, as I must, for my proper role as judge, I am pleased to join Judge Spencer's opinion.

The Commonwealth's contention that a facial challenge to the amended statute is foreclosed on the basis of *stare decisis* is a legal formalism that I find wholly unpersuasive. For the reasons stated in

the majority opinion, it simply could not be more clear that the Virginia legislature amended the statute *exactly because* the prior law did not reach electronic media. I do not believe resolution of the compelling overbreadth claims asserted by plaintiffs in this case can or should be avoided in this way.

On the merits, the majority opinion is unwaveringly faithful to extant First Amendment and Commerce Clause principles. Perhaps it is true, as Justice Holmes famously stated, that hard cases sometimes make bad law, and certainly, as we all know, rapid advances in technology sometimes make hard cases. *E.g.*, *Kyllo v. United States*, 533 U.S. 27 (2001)(holding that use of a thermal imaging device to measure heat escaping from a residence constitutes a search of the residence); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2000)(finding unconstitutional certain provisions of the Child Pornography Prevention Act of 1996, 18 U.S.C. §§ 2251 *et seq.*). But the majority opinion makes no law at all, good or bad. Rather, it simply applies settled law to new facts, and it does so in a manner that is consonant with and well within the boundaries of the judicial function. It is no answer to the plaintiffs' claims that, to achieve its assuredly compelling interest in protecting children from exposure to online pornography, Virginia has done the best that available technological know-how allows. In a related context, the Supreme Court has cautioned that "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter." *Id.* at 255. Similarly, the online dissemination of protected speech may not be criminalized (a surefire form of suppression) merely because such speech might be accessible to Virginia's inadequately-supervised minors. Thus, Virginia's effort to do for parents and guardians what they— without the constraints imposed by constitutional prohibitions — are free (and better able) to do for themselves, fails. Nor may Virginia reach beyond her border to suppress online speech *everywhere*, even if such an attempt had any plausible prospects of success, which of course it does not.

It may be that the Supreme Court will one day undertake the task of creating a new metric of speech protection for the "Age of the Internet," but it has not done so to date. Accordingly, I fully concur in the opinion affirming the judgment of the district court.

NIEMEYER, Circuit Judge, dissenting:

Acting under its police powers, the Commonwealth of Virginia enacted Virginia Code § 18.2-391 making it unlawful "to knowingly display for commercial purpose" pornographic materials that are harmful to juveniles "in a manner whereby juveniles may examine and peruse" them. Va. Code Ann. § 18.2-391(a) (1985). Materials were designated to include any visual representation or image, any printed matter however reproduced, and any sound recording. *Id.*

In 1988, the Supreme Court of Virginia construed the scope of this statute narrowly, *see Commonwealth v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618 (Va. 1988), and based on this narrow construction, we held the statute to be constitutional against a First Amendment challenge, *see Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127-28 (4th Cir. (1989) (concluding that the statute "places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state's police powers"), *cert. denied*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 494 U.S. 1056 (1990).

Virginia amended § 18.2-391 in 1999 to make it explicit that the specified examples of visual, written, and recording media that were regulated included any "electronic file or message." Va. Code Ann. § 18.2-391(A) (1999).

This action was commenced to mount a renewed facial First Amendment challenge to this statute, as amended in 1999. On plaintiffs' motion for summary judgment, the district court held that the statute violated the First Amendment, as well as the dormant Commerce Clause, of the U. S. Constitution, and permanently enjoined enforcement of the statute in the electronic medium. On appeal, the majority now affirms.

For the reasons that follow, I disagree and therefore respectfully dissent. First, we rejected a facial First Amendment challenge to this statute in *American Booksellers*, 882 F.2d 125, and that ruling now binds us in this case, compelling us to uphold the constitutionality of the statute against this second facial challenge. Second, even if we conduct the First Amendment analysis again, I would find the statute constitutional because (1) Virginia has a compelling interest in pro-

tecting its juveniles from harmful pornographic materials, (2) the Virginia statute employs the least restrictive alternative that will promote Virginia's interest, especially in view of the Virginia Supreme Court's authoritative construction of the statute, and (3) by application of minimally burdensome technology that is now available, no speech among adults is suppressed. I would also conclude that the statute does not violate the dormant Commerce Clause. Accordingly, I would reverse the judgment of the district court and vacate the injunction that the district court entered against enforcement of Virginia Code § 18.2-391.

## I

When first enacted in 1970, Virginia Code § 18.2-391 applied only to the sale, rental, or loan of pornographic material deemed "harmful to juveniles." Virginia modeled its statute on a New York statute upheld against a First Amendment challenge by the Supreme Court in *Ginsberg v. New York*, 390 U.S. 629 (1968).

In 1985, Virginia amended § 18.2-391 to prohibit not only the sale, rental, or loaning of material deemed "harmful to juveniles," but also to the knowing display of such materials for commercial purpose. In amended form, the statute provided:

(a)   It shall be unlawful for any person knowingly to sell, rent or loan to a juvenile, *or to knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse*:

1.   Any picture, photography, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or

2.   Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in subdivision (1) of this subsection, or explicit   and   detailed   verbal   descriptions   or   narrative

accounts of sexual excitement, sexual conduct or sadomas-
ochistic abuse and which, taken as a whole, is harmful to
juveniles.

Va. Code Ann. § 18.2-391(a) (emphasis added to identify statutory
language inserted by amendment) ("1985 Version").

The 1985 Version of the statute became the subject of a First
Amendment challenge that produced five opinions by the U.S.
Supreme Court, the Supreme Court of Virginia, and our court, but in
the end it was held not to violate the First Amendment.

When we first reviewed the 1985 Version of the statute, conducting
a review of a facial challenge, we held that the 1985 Version "dis-
courage[d] the exercise of first amendment rights in a real and sub-
stantial fashion, in that it [was] not readily subject to a narrowing
interpretation so as to withstand an overbreadth challenge." *Am.
Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691, 696 (4th Cir. 1986)
("*American Booksellers I*"). Although Virginia stressed that "only a
small percentage of the inventory in book stores could be classified
as harmful to juveniles" and therefore that "retail outlets [could] read-
ily modify their display methods to comply with the amendment," we
rejected Virginia's characterizations. *Id.* We ruled that "[t]he display
methods suggested by the Commonwealth appear[ed] either insuffi-
cient to comply with the amendment or unduly burdensome on the
first amendment rights of adults . . . ." *Id.* We reasoned that "[p]lacing
'adults only' tags on books and magazines or displaying the restricted
material behind blinder racks or on adults only shelves freely accessi-
ble in the main part of the store would not stop any determined juve-
nile from examining and perusing the materials." *Id.* Further,
"[f]orcing a bookseller to create a separate, monitored adults only sec-
tion, requiring that the materials be sealed, or taking the materials off
display and keeping them 'under the counter' unreasonably inter-
fere[d] with the booksellers' right to sell the restricted materials and
the adults' ability to buy them." *Id.*

On review, the U.S. Supreme Court concluded that the Virginia
Supreme Court's construction of the statute might better determine
the statute's constitutionality: "[A]n authoritative construction of the
Virginia statute by the Virginia Supreme Court would substantially

aid our review of [the] constitutional holding, and might well determine the case entirely." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386 (1988). The Court accordingly certified two questions regarding interpretation of the 1985 Version to the Supreme Court of Virginia, pursuant to Rule 5:42 of the Virginia Supreme Court. *Id.* at 398. Focusing on the scope of the law's coverage, the United States Supreme Court asked in its first question:

> Does the phrase "harmful to juveniles" as used in Virginia Code §§ 18.2-390 and 18.2-391 (1982 and Supp. 1987), properly construed, encompass any of the books introduced as plaintiffs' exhibits below, and what general standard should be used to determine the statute's reach in light of juveniles' differing ages and levels of maturity?

*Id.* at 398. Virginia argued that none of the 16 books that were submitted by the plaintiffs as books covered by the statute were in fact covered by the statute. It maintained that the reach of the statute was much narrower. *Id.* at 393-94. The U.S. Supreme Court noted that "[i]f that is true, methods of compliance exist that are substantially less burdensome than those discussed by the lower courts." *Id.* at 394. The Court concluded that "it is essential that we have the benefit of the law's authoritative construction from the Virginia Supreme Court." *Id.* at 395.

In the second question, the U.S. Supreme Court focused on what compliance measures potential defendants could take to avoid running afoul of the law's prohibition. Accordingly, the Supreme Court posed as its second question:

> What meaning is to be given to the provision of Virginia Code § 18.2-391(a) (Supp. 1987) making it unlawful "to knowingly display for commercial purpose in a manner whereby juveniles may examine or peruse" certain materials? Specifically, is the provision complied with by a plaintiff bookseller who has a policy of not permitting juveniles to examine and peruse materials covered by the statute and who prohibits such conduct when observed, but otherwise takes no action regarding the display of restricted materials?

> If not, would the statute be complied with if the store's policy were announced or otherwise manifested to the public?

484 U.S. at 398. Whereas the plaintiffs alleged that compliance with the law would require drastic measures such as reconfiguring the store or completely barring minors from the store, Virginia argued that "a bookseller will not be subject to criminal prosecution if, as a matter of store policy, the bookseller prevents a juvenile observed reviewing covered works from continuing to do so, even if the restricted materials are not segregated." *Id.* at 396. The U.S. Supreme Court explained the importance of the second question: "If this is what the statute means, the burden to the bookseller, and the adult book buying public, is significantly less than that feared and asserted by plaintiffs." *Id.* at 397.

The Supreme Court of Virginia accepted the certified questions and responded to the first question, applying the three-part test set forth in the statute, Va. Code Ann. § 18.2-390(6), defining the term "harmful to juveniles."\* *Commonwealth v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618 (Va. 1988). As to the first two prongs of the test, the court recognized that they presented questions of fact for determination by a properly instructed jury. *Id.* at 623. The third prong, however, was found to involve a mixed question of law and fact that the court could properly decide. *Id.* The court concluded that "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." *Id.* at 624. The Virginia court then concluded that none of the books submitted by the plaintiffs as exhibits lacked serious literary, artistic,

---

\*Quoting Virginia Code § 18.2-390(6):

"*Harmful to juveniles*" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it (a) predominantly appeals to the prurient, shameful or morbid interest of juveniles, (b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and (c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.

political, or scientific value for a legitimate minority of older, normal adolescents, and thus *none* of the books were "harmful to juveniles" within the meaning of Va. Code Ann. § 18.2-390(6). *Id.*

The Supreme Court of Virginia also provided a narrow construction of the 1985 Version in responding to the certified question focusing on compliance measures. The court explained that the scienter requirement in the statute was significant:

> A violation must consist of proof beyond a reasonable doubt that [1] the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, [2] being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles.

372 S.E.2d at 625. Again, the court stated, "[r]easonable efforts to prevent perusal of harmful materials by juveniles are all that the statute requires of a bookseller." *Id.* According to the Virginia court, "[t]he question whether a bookseller's efforts were reasonable, in any given set of circumstances is, of course, an issue of fact to be resolved by a properly-instructed jury, but certain general principles may be discerned." *Id.* The court then provided "a clear example of a method a bookseller might easily adopt" to avoid violating the statute. *Id.* If a bookseller placed all restricted books on a shelf in the sight of the bookseller and intervened whenever a juvenile attempted to peruse and examine books on that shelf, then the bookseller would be in compliance with the statute. *Id.* Finally, with the assumption that "the hypothetical bookseller 'who has a policy of not permitting juveniles to examine and peruse materials covered by the statute' does not merely cerebrate upon such a policy, but takes reasonable steps to put it into effect," the court answered the second certified question in the affirmative. *Id.* According to the Virginia Supreme Court, the 1985 Version "imposes a relatively light burden upon the bookseller, in contrast to the state's interest in protecting juveniles from materials harmful to them." *Id.*

Upon receipt of the Supreme Court of Virginia's answers to the two certified questions, the U.S. Supreme Court vacated our decision in *American Booksellers I* and remanded the case to us for reconsider-

ation of the case in light of the Virginia Supreme Court's answers construing the statute narrowly. *Virginia v. Am. Booksellers Ass'n, Inc.*, 488 U.S. 905 (1988).

In view of the Virginia Supreme Court's construction of the statute, we reversed our previous conclusion that the 1985 Version was unconstitutional under the First Amendment. *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 126 (4th Cir. 1989) ("*American Booksellers II*"). We noted that the Supreme Court of Virginia's explanation that "the 1985 amendment was not aimed at mere browsing but at 'the opportunity [a bookseller] may afford to juveniles to take off the shelves books which they are unable to buy, and to read them in the store.'" *Id.* at 127. Most importantly, we stated that we "agree with the Virginia Supreme Court that the amendment to the statute places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state's police powers." *Id.* at 127-28. The 1985 Version was thus ultimately held constitutional against a facial First Amendment challenge. The Supreme Court denied the petition for a writ of certiorari. *Am. Booksellers Ass'n, Inc. v. Virginia*, 494 U.S. 1056 (1990).

To clarify the all-inclusiveness of § 18.2-391 — which applied to any visual representation or image, any printed matter however reproduced, and any sound recording — and to make explicit that visual, written, or sound-recorded materials include those created or transmitted electronically, Virginia amended the statute in 1999 to specify that a visual representation or image includes an "electronic file or message containing an image" and that printed matter however reproduced includes an "electronic file or message containing words." 1999 Va. Acts ch. 936 (codified as Va. Code Ann. § 18.2-391(A)) (the "1999 Amendment").

The plaintiffs commenced this action as a second facial challenge of § 18.2-391 in view of the clarifying 1999 Amendment. Contending that the statute is unconstitutional under the First Amendment and under the dormant Commerce Clause of the U.S. Constitution, they allege that the 1999 Amendment extended the reach of the 1985 Version of the statute from physical space into cyberspace and that, because of the nature of the Internet, the 1999 Amendment is not sufficiently precise to withstand strict scrutiny under the First Amend-

ment. They also allege that Virginia's regulation imposes an undue burden on interstate commerce because the effect of the statute is to restrict commercial electronic materials in all states, not just Virginia, for which the statute was enacted. Because the plaintiffs filed this action before enforcement of § 18.2-391 as amended in 1999, there are no facts to govern its application in this case. The plaintiffs could and did allege only how they believed they would be affected by enforcement of the statute. The plaintiffs are businesses that provide Internet access (e.g., PSINet, the Commercial Internet Exchange Association); businesses that provide content transmitted over the Internet (e.g., Charlottesville Sexual Health & Wellness Clinic, A Different Light Bookstores); individuals who provide content transmitted over the Internet (e.g., Susie Bright); and membership organizations representing individuals whose access to pornographic materials would be limited by the law (e.g., People for the American Way).

The district court granted the plaintiffs' motion for summary judgment and permanently enjoined Virginia from enforcing Virginia Code § 18.2-391 "to the extent it prohibits the sale, rental, loan or display of an 'electronic file or message containing an image' or an 'electronic file or message containing words.'" *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 892 (W.D. Va. 2001). In doing so, the court ruled that the extension of the law to the Internet created a violation of the First Amendment where there previously had been none. As the district court explained:

> The pre-amendment version of section 18.2-391 applied only to traditional media in physical spaces, and thus made it possible to restrict minors' access to indecent material without substantially burdening adult access. . . . [T]he same cannot be said for material on the Internet. That is, efforts to comply with the 1999 [Amendment] will result in the exclusion of too many adults from accessing material to be constitutionally sound.

*Id.* at 887. The district court also held that the 1999 Amendment violated the dormant Commerce Clause. As the court explained:

> [S]tate laws regulating cyberspace pornography currently impose a much greater burden on out-of-state businesses

providing adult material on the Internet than state laws regulating real-space pornography imposed on out-of-state adult magazine publishers and other real-space pornography providers. . . . Thus, to avoid prosecution, an adult Web site operator must comply with the most restrictive state obscenity regulations if it is to make its content available on the Web at all. . . . This leads the court to conclude that, due to the current status of geographic filtering technology on the Internet, § 18.2-391 violates the Commerce Clause.

*Id.* at 891.

From the district court's permanent injunction entered against Virginia on October 11, 2001, prohibiting enforcement of the 1999 Amendment, Virginia appealed.

## II

The Commonwealth of Virginia contends first that *American Booksellers II*, 882 F.2d 125, which rejected a facial challenge to the statute on vagueness and First Amendment grounds, precludes this second facial challenge to the extent that this challenge is also based on the First Amendment. It acknowledges that *American Booksellers II* does not preclude consideration of the dormant Commerce Clause issue, nor would it preclude a later "as applied" claim filed by persons who were not party to the *American Booksellers* case. But Virginia notes correctly that this case is not an "as applied" claim, but a second facial challenge.

The district court rejected Virginia's position, citing three reasons. First, the court observed that "common sense tells a reader of the statute that the initial catch-all phrases of the statute do not cover Internet materials." *PSINet, Inc. v. Chapman*, 108 F. Supp. 2d 611, 620 (W.D. Va. 2000). The court pointed out that "printed matter however reproduced" in the statute "refers to *printed matter* — not electronic material." *Id.* Second, the district court noted that when the 1985 Version was enacted, "Internet communication was not envisioned." *Id.* And third, it asserted that by making the change, the Virginia legislature must be "presumed to act with purpose" and therefore it "add[ed] something entirely different to the statute." *Id.* at 620-21.

As amended in 1985, § 18.2-391 makes unlawful a commercial transaction through which pornographic material harmful to juveniles is sold, rented, loaned, or displayed. The media that are included in the 1985 statute are: "Any picture, photography, drawing, sculpture, motion picture film, or similar visual representation or image" and "[a]ny book, pamphlet, magazine, printed matter however reproduced, or sound recording." Va. Code Ann. § 18.2-391(a) (1985). In reading this statute in a common sense manner, the district court seemed to have been focused on "printed matter" and did not recognize the breadth of the statute, which not only includes very specific media as examples but which also indicates an intent to cover *all media that may be seen, read, or heard*. Stripped of the examples provided, the statute prohibits the transference of pornographic material harmful to juveniles through any "visual representation or image," any "printed matter however reproduced," and any "sound recording." The obvious focus of the Virginia legislature was on all media that reach the eyes or ears of juveniles. Thus, when the Virginia legislature added as another example of those media, the electronic medium "containing an image" or "containing words," it was not adding substance to the previous intended language of any "visual representation or image," any "printed matter however reproduced," and any "sound recording." Surely, the original statutory language would include harmful material displayed on video tape played on a television or created by electronic means, such as a digital camera. I respectfully submit that common sense — rather than suggesting an interpretation restricted to any medium that does not include the electronic medium — suggests that the Virginia legislature always intended to include all media, and when it added the electronic medium to the list of examples included, it was simply clarifying the statute for the increasingly pervasive electronic age. There is no indication that the 1985 Version was intended to exclude any medium then in place or thereafter possible. Rather, the defining criteria were *visual* material, *words*, and *sound*.

The district court's observation that the Internet could not have been envisioned by the legislature in 1985 and therefore it was necessary to add the reference to electronic medium is unfounded for two reasons. *First*, it is apparent historically that in 1985, the distribution of pornography by tape recordings and computers was already a problem and that at least one state legislature had already addressed it and

others were addressing it. *See* Computer Pornography and Child Exploitation Act of 1985, S. 1305, 99th Cong. (1985); Computer Pornography and Child Exploitation Act: Hearings on S. 1305 Before the Subcomm. on Juvenile Justice of the Senate Comm. on the Judiciary, 99th Cong. 17 (1985) (testimony of Kenneth V. Lanning, FBI Special Agent, describing the use of computer bulletin boards by pedophiles to communicate with one another); 1982 Cal. Stat. c.936, at 3395 (amending section 313 of the California Penal Code by adding "computer program" to the list of media capable of disseminating harmful matter to children); D'Vera Cohn, Kiddy Porn Enters Computer Age, United Press International, Dec. 8, 1982 (describing the increasing use of computers and video recorders by child pornographers); Police Uncover Child Pornography Ring, Associated Press, Feb. 6, 1980 (reporting arrest of suspect "accused of plotting a national and possibly worldwide computerized child pornography scheme").

*Second*, a statute that uses clearly inclusive language is not rendered inoperable for unanticipated circumstances that fall within the scope of the language. For example, the Fourteenth Amendment prescribes that no state may make any law denying "any person" "equal protection of the laws." Yet no one anticipated at the time of its ratification in 1868 that all of the privileges accorded to men must also be accorded to women. Nonetheless, the unambiguous language of the protection included women, and it is so construed today. This follows the basic canon of statutory interpretation that we give the words in text their natural meaning, and so long as that meaning is not ambiguous, we presume that to be the intent of the legislature, even though such intent might be historically questioned.

Finally, the district court reasoned that by making an amendment in 1999, the Virginia legislature must have had a purpose. That purpose, however, need not have been to make a substantive change expanding the scope of the statute. An equally valid purpose would have been to provide clarification to a statute that would be increasingly applied to the electronic medium. Indeed, because of the preexisting all-inclusive language, it is reasonable to conclude that the 1999 Amendment was only a clarification and not an expansion of the statute's proscription.

Yet the majority accepts the reasoning of the district court in rejecting the applicability of *American Booksellers II* and, indeed, chooses

to reverse it. My independent review of this issue does not permit me to join a ruling rejecting the application of binding precedent.

It is readily apparent to me that our decision in *American Booksellers II* has binding force on the question whether Virginia Code § 18.2-391 is constitutional under the First Amendment. The arguments that were made in that first facial challenge are the same that are now made in this case, and the reasons on which we relied in *American Booksellers II* to reject those arguments also now apply here.

In *American Booksellers I*, the challenge to the statute was a facial challenge based on vagueness and on violation of the First Amendment. In our first review, we concluded, as did the district court in this case, that § 18.2-391 was unconstitutional. When Virginia argued that "retail outlets" selling pornography could "readily modify their display methods to comply" with the statute, we said that the methods suggested were either "*insufficient*" or "*unduly burdensome*." *American Booksellers I*, 802 F.2d at 696 (emphasis added). We agreed with the plaintiffs' assertion "that the display provision of the [1985 Version] will unreasonably restrict adult access to materials protected under the first amendment," *id.* at 894, stating that the 1985 Version

> discourages the exercise of first amendment rights in a real and substantial fashion, and . . . it is not readily subject to a narrowing interpretation so as to withstand an overbreadth challenge.

*Id.* at 696. All of these grounds are parroted in this case by the district court, and now by the majority.

On review of *American Booksellers I*, however, the Supreme Court observed that if the statute could be construed narrowly, then it might survive the constitutional challenge under the First Amendment. The Court restated the standing constitutional principle applicable to facial challenges that if "'readily susceptible' to a narrowing construction that would make it constitutional, [a statute] will be upheld." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (citations omitted). The Court accordingly certified to the Virginia Supreme Court the question of whether the statute was to be construed nar-

rowly. When the Virginia Supreme Court indicated that the statute should be narrowly construed to save it from invalidity, *Commonwealth v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618, 624-25 (Va. 1988), the U.S. Supreme Court vacated our holding in *American Booksellers I*. On remand, we reconsidered our rulings in *American Booksellers I*, and in light of Virginia's authoritative construction of the statute, we upheld it under the First Amendment. *American Booksellers II*, 882 F.3d at 127-28. We stated that the burden imposed in § 18.2-391 that no person shall "display for commercial purpose in a manner whereby juveniles may examine and peruse" pornographic materials harmful to juveniles "places a minimal burden on booksellers and represents a constitutionally permissive exercise of the state's police powers." *Id.* Even though the argument leading to that language was presented to us from a bookseller's point of view, the analysis of the provision's constitutionality and our holding were stated more broadly, and they now clearly apply.

Since this is merely a renewed challenge in which the same First Amendment arguments are made as were made in *American Booksellers II*, albeit now presented to us by a purveyor using the electronic medium, the holding of *American Booksellers II* is binding. With respect to the book medium that we considered there, we necessarily held that persons could not openly display books containing material harmful to juveniles in an open air market, even though such a market might be organized to sell books. We held that the implicit requirement imposed by the statute on booksellers (1) to conceal harmful books from the public at large and (2) to reveal them only to adults did not place an undue burden on the booksellers' right to sell constitutionally protected material. When our holding is considered in its full breadth, it becomes apparent that it reaches any commercial purveyor of harmful materials. Thus, under *American Booksellers II*, a seller of harmful materials over the Internet or through any other medium would have to conceal the harmful materials from the public at large and reveal them only to adults. And in light of the technological controls available to such commercial purveyors on the Internet and now being used by them — as demonstrated in Part III, below — the burden is not significantly different from that imposed on booksellers.

I therefore agree with Virginia that the First Amendment issue is "settled" and that this second "First Amendment facial challenge is

foreclosed." But even on the merits under a strict-scrutiny analysis, this facial challenge fails as did the first facial challenge.

### III

The standard for our review is well known. A content-based restriction on constitutionally protected speech is constitutional under the First Amendment only if it survives strict scrutiny; it "must be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.*

The district court, as well as the parties, agree that Virginia has a compelling interest in denying juveniles access to pornographic materials that are harmful to juveniles, as described by the statute — materials that depict "sexually explicit nudity, sexual conduct or sadomasochistic abuse" or that contain "explicit and detailed" narratives of "sexual excitement, sexual conduct or sadomasochistic abuse." Va. Code Ann. § 18.2-391(A)(1), (2). The sole issue on the plaintiffs' facial challenge based on First Amendment grounds is whether the 1999 Amendment is narrowly tailored to promote Virginia's interest in denying juveniles access to pornographic materials harmful to them.

Concluding that the statute was unconstitutional, the district court did not identify any less restrictive alternative that would suggest that the statute was not narrowly tailored. Indeed, the court appears to have concluded that the statute was narrowly tailored but, even so, that in *balancing* the burden imposed by the statute against the benefits gained, the burden "outweighed" the benefits. *Such a balancing test, however, does not form part of the strict scrutiny analysis.* When it is accepted that the State's restriction on speech promotes a compelling governmental interest, the test that we must apply is whether the restriction is narrowly tailored to promote the State's interest. *Playboy*, 529 U.S. at 813.

Not only did the district court fail to identify a less restrictive alternative to promote Virginia's compelling interest, it concluded that the alternatives available were not unduly burdensome. As Virginia had

amply demonstrated in the record, the district court recognized that credit card identification systems and PIN numbers, as well as age verification services, are available and effective to restrict a zone of the Internet to adults. Indeed, the district court found that "the costs associated with implementing credit card screening devices and adult PIN systems are unlikely to drive adult Web sites from the 'market-place of ideas.' The fact that thousands of adult Web sites currently utilize verification systems suggests that the burden associated with maintaining such a system is outweighed by the continued consumer demand for the content these Web sites provide." *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001). The district court acknowledged that because the Virginia statute is limited to material displayed for a *commercial* purpose, the concerns expressed in *Reno v. ACLU*, 521 U.S. 844, 865 (1997) (recognizing that the New York statute held constitutional in *Ginsberg v. New York*, 390 U.S. 629 (1968), "applied only to commercial transactions"), were not present in this case. *PSINet*, 167 F. Supp. 2d at 888. The district court thus concluded explicitly that Virginia's statute — the 1999 Amendment — was not "overly burdensome on commercial Web sites." *Id.*

This finding by the district court should have ended the strict-scrutiny analysis under the First Amendment, with the conclusion that the statute did not violate the Constitution. But the district court reached an opposite conclusion, relying on a newly fabricated balancing test and on its further observation that the 1999 Amendment

> does not include an affirmative defense to prosecution for commercial Web sites if they in fact incorporate such compliance measures. Thus, even the most responsible adult Web sites may have legitimate concerns that they will be subjected to criminal liability in the State of Virginia.

*PSINet*, 167 F. Supp. 2d at 888. The court thus held that the implicit burden created by the threat of criminal prosecution would inappropriately "chill" the plaintiffs' First Amendment rights. *Id.*

Even as the district court's analysis lies outside of the strict scrutiny analysis, the district court also misapprehended the liability imposed by the Virginia statute — noting the absence of an affirmative defense for reasonable compliance efforts — and therefore the

court miscalculated the extent of any "chilling" effect. The statute includes the substance of such a defense as part of the State's proof in establishing a violation. It punishes persons who "knowingly display" materials harmful to juveniles. And the Virginia Supreme Court has authoritatively interpreted this liability narrowly:

> A violation must consist of proof beyond a reasonable doubt that the bookseller knowingly afforded juveniles an opportunity to peruse harmful materials in his store or, being aware of facts sufficient to put a reasonable person on notice that such opportunity existed, took no reasonable steps to prevent the perusal of such materials by juveniles.

*Commonwealth v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618, 625 (Va. 1988). Thus, to be liable under this statute, the prosecution would have to show that commercial websites (1) *knowingly* permitted juveniles an opportunity to peruse harmful materials, or (2) *took no reasonable steps* to prevent such perusal when they were aware of facts putting a reasonable person on notice of the possibility. *Id.* at 625. This hardly exposes commercial websites to the broad liability feared by the district court.

As Virginia demonstrated in the record, just as booksellers could create zones in their bookstores limited to adult materials and could restrict the perusal and sales of those books to adults, websites can create zones on the Internet limited in access to adults. No adult would, through this process, be denied access to constitutionally protected speech. *See Ginsberg*, 390 U.S. at 638 & n.6. Rather, minimally burdensome steps would have to be taken to create such adult zones and to limit access to adults. The Supreme Court has recognized the nexus between the availability of Internet filtering technology and the maintenance of adult access to online pornographic materials. *See Reno v. ACLU*, 521 U.S. 844, 876-77, 881-82 (1997). In *Reno*, the Court credited the district court's finding that "at the time of trial existing technology did not include any effective method for a sender to prevent minors from obtaining access to its communications on the Internet without also denying access to adults," *id.* at 876, and the Court therefore commended the district court's refusal "to rely on unproven future technology to save the [Communications Decency Act]," *id.* at 882.

But as Justice O'Connor pointed out, "it is possible to construct barriers in cyberspace and use them to screen for identity, making cyberspace more like the physical world and, consequently, more amenable to zoning laws." *Reno*, 521 U.S. at 890 (O'Connor, J., concurring in the judgment in part and dissenting in part). In the context of 1997, however, Justice O'Connor recognized that the necessary technology was available but was too insufficiently dispersed on the Internet to be relied upon for purposes of the Communications Decency Act. As she put it, "Gateway technology is not ubiquitous in cyberspace, and because without it 'there is no means of age verification,' cyberspace still remains largely unzoned — and unzoneable." *Id.* at 891. (O'Connor, J., concurring in the judgment in part and dissenting in part) (quoting *ACLU v. Reno*, 929 F. Supp. 824, 846 (E.D. Pa. 1996)).

Yet, only five years later, when the Supreme Court reviewed Congress' next attempt to regulate Internet obscenity — the Child Online Protection Act (COPA) — it recognized that a publisher of pornographic materials on the Internet could target certain audiences and "need only take the simple step of utilizing a medium that enables it to target the release of its material into those communities." *Ashcroft v. ACLU*, 535 U.S. 564, 583 (2002). Indeed, the Court recognized that COPA did not "foreclose an entire medium of expression" on the Internet because it "only requires that such material be placed behind adult identification screens." *Id.* at 583 n.14. Thus, within five years' time, the cyber-barriers that Justice O'Connor had referred to in *Reno* had become widespread and effective.

And now, the district court in this case has concluded that technological mechanisms exist to create adult zones by using credit cards, passwords, PIN identification, adult verification services, and website self-identification methods. *PSINet*, 167 F. Supp. 2d at 887-88. Moreover, Virginia points out what the district court accepted and what the Supreme Court recognized in *Ashcroft v. ACLU*:

> In the world of web-based commercial pornography, "electronic screens" requiring credit card or age verification devices are commonplace. So, too, are "teasers," hardcore pornography strategically placed *in front of such screens. All commercial pornographers need to do to abide by Vir-*

*ginia law is to move these pre-existing "screens" so that
such screens appear before pornographic teasers are dis-
played.*

*Accord Ashcroft*, 535 U.S. at 583 n.14 (citing "adult identification
screens" as a feasible Internet alternative).

To reach its conclusion that Virginia's statute violates the First
Amendment, the majority relies on propositions that are unsupported
by the record or that are irrelevant to a determination of the scope of
the statute. For example, the majority says that "Internet speakers
have no way of preventing Virginia juveniles from accessing their
Internet speech." *Ante* at 12. Yet, as has been pointed out, Virginia
demonstrated and the district court accepted the fact that commercial
websites distributing pornography are using available technology
effectively to create adult zones to regulate access to their material.
*See PSINet*, 167 F. Supp. 2d at 888.

The majority also says that § 18.2-391's "attempt to deny minors
access to potentially harmful speech . . . will 'effectively suppress[ ]
a large amount of speech that adults have a constitutional right to
receive and to address to one another.'" *Ante* at 12 (quoting *Reno*, 521
U.S. at 874). Yet, there is no evidence in the record that the Virginia
statute will operate to suppress any speech among adults. Both Vir-
ginia and the district court recognized that adults functioning under
the statute will always have access to commercially purveyed porno-
graphic materials. The only question that arose was whether the
mechanisms for restricting access to adults was too burdensome. Just
as adults who want access to adult magazines and books must enter
a bookstore and demonstrate their age to the bookseller, Virginia has
demonstrated that adults wanting pornography from commercial pur-
veyors on the Internet must enter an adult zone through use of credit
cards, PINs, or other demonstrated technological gateways before
gaining access to adult material. Notably, the statute does not reach
non-commercial exchanges occurring in e-mail or chat-rooms.

To support its view that the statute overreaches in the scope of its
enforcement, the majority essentially discards the Virginia Supreme
Court's holding that the statute is not violated if a website takes "rea-

sonable steps" to assure that juveniles are not perusing harmful mate-
rial. The majority says,

> [T]here is no indication that the use of a PIN number would
> be considered a "reasonable step" to prevent "reasonably
> apparent" perusal by juveniles. As the Plaintiffs have previ-
> ously pointed out, the Commonwealth would certainly not
> agree that a liquor or tobacco store that sold to anyone with
> a valid credit card number, without some additional step to
> ascertain the age of the customer, was taking reasonable
> steps to exclude juveniles from the purchase of age prohibi-
> tive products.

*Ante* at 14. Yet Virginia demonstrated and the district court accepted
the facts that the use of credit cards, PINs, and age verification ser-
vices are minimally burdensome and that even today, they are used
effectively on the Internet.

> The fact that thousands of adult Web sites currently utilize
> adult verification systems suggests that the burden associ-
> ated with maintaining such a system is outweighed by con-
> tinued consumer demand for the content that these Web
> sites provide. . . . [Moreover] commercial Web sites are less
> likely than noncommercial sites to be so burdened by the
> implementation of an adult identification system that they
> are forced to withdraw their content from the Internet.

*PSINet*, 167 F. Supp. 2d at 888. Realizing that this evidence is in the
record and that the district court made the conclusions that it did, the
majority argues further, if not somewhat desperately, that "many
adults may be unwilling to provide their credit card number online,
and would therefore not visit the site. Such a restriction would also
serve as a complete block to adults who wish to access adult material
but do not own a credit card." *Ante* at 14. But so too are many adults
unwilling to enter an adult bookstore and ask for material protected
from juveniles. Moreover, we held in *American Booksellers II* that the
Virginia statute imposing these burdens on adults is constitutional
against the First Amendment challenge.

Finally, the majority falls back on the notion that if the statute
operates as Virginia suggests, the statute would be rendered "power-

less." *Ante* at 16. This effect, however, is a legislative judgment that must be left to the Virginia legislature. Certainly by creating adult zones for commercial websites that distribute pornography, the legislation reduces the range and quantity of materials accessible to juveniles. It has been often stated that a legislature need not solve the entire problem; it is free to take steps to solve only part of the problem. *See*, *e.g.*, *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

At bottom, just as the Virginia statute has already been upheld for constitutionality when argued from the point of a bookseller, who was impliedly required to undertake minimally burdensome steps to deny juveniles access to harmful materials while preserving access for adults, a facial review now leads to the same conclusion when argued from the point of view of a seller from an Internet website.

Virginia is justifiably concerned with the open and unrestricted display of pornographic materials harmful to juveniles, and it concededly has a compelling interest in imposing restrictions on display of those materials. The 1985 Version of § 18.2-391, as well as the 1999 Amendment, imposes restrictions on the display of such materials to juveniles for commercial purposes, without denying adults any constitutionally protected speech. *See Ginsberg*, 390 U.S. at 638 & n.6. And this statute, as authoritatively construed by the Virginia Supreme Court, provides a narrowly tailored response directed at commercial purveyors of these harmful materials, directing that they may not *knowingly* display such materials to juveniles and, if they are aware that such juveniles are perusing such materials, they must take *reasonable steps* to prevent the perusal. The State has identified the steps that websites can reasonably take, and the district court properly found those steps to be not unduly burdensome.

I would, therefore, uphold Virginia Code § 18.2-391(A) against the First Amendment challenge made in this case.

IV

Finally, Virginia contends that the district court erred in finding that § 18.2-391 violates the dormant Commerce Clause. The district court held that the Virginia statute unduly burdens interstate com-

merce by placing restrictions on electronic commercial materials in all states. The court stated:

> State obscenity regulations are not invalidated under the Commerce Clause because they impose compliance costs on businesses located outside their state's borders.
>
> Nevertheless, state laws regulating cyberspace pornography currently impose a much greater burden on out-of-state businesses providing adult material on the Internet than state laws regulating real-space pornography. . . . [T]o avoid prosecution, an adult Web site operator must comply with the most restrictive state obscenity regulations if it is to make its content available on the Web at all. In contrast, purveyors of real-space pornography can choose to comply with the regulations of only those states to which they affirmatively distribute. This leads the court to conclude that . . . section 18.2-391 violates the Commerce Clause.

*PSINet*, 167 F. Supp. 2d at 891 (footnote omitted).

For statutes that do not facially discriminate against interstate commerce, the Supreme Court has adopted an analysis for determining whether a State regulation unconstitutionally burdens interstate commerce:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (citation omitted) (quoted in *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 99 (1994)).

There is no dispute in this case that Virginia has a "legitimate local public interest" in denying juveniles pornography material deemed harmful to them. Indeed, the parties, as well as the district court, agree that Virginia has a compelling interest in regulating pornography harmful to juveniles. The only question remaining is whether the burden imposed by § 18.2-391 on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

The district court's own conclusions based on the demonstrated technology appear to resolve this question readily. It found that the compliance measures necessitated by § 18.2-391 are not "overly burdensome on commercial Web sites," *PSINet*, 167 F. Supp. 2d at 888, and "are unlikely to have a substantial effect on commercial Web site operators," *id.* at 889. The specific burden on First Amendment rights that the district court determined would overwhelm Virginia's compelling interest was the denial of adult access to pornography, not § 18.2-391's putative burden on interstate commerce.

Thus, I agree that Virginia has a compelling State interest in regulating pornography harmful to juveniles within the jurisdictional limits of its sovereignty, and the burden that § 18.2-391 would impose on Internet purveyors would be minimal. I also agree with Virginia's observation that:

> Website operators may still purvey pornography. Adults seeking such material from the Internet may still readily obtain it. All the [Virginia] law requires is that the harmful materials — including free materials — be placed *behind* the electronic screens already in use, rather than posted as "teasers" in front of it.

Accordingly, I would uphold Virginia's statute under the facial challenge made pursuant to the dormant Commerce Clause.

V

Virginia has made a staunch attempt to promote its compelling interest in denying juveniles access to harmful pornographic materials while at the same time minimizing the burdens of its regulation on

adults. It began in 1970 by tailoring its statute after the Supreme Court's decision in *Ginsberg*. And when it amended this statute in 1985, it narrowly tailored the statute to comport with the First Amendment, as we concluded in *American Booksellers II*. Finally, when it amended the statute in 1999 to clarify its application to the Internet, Virginia made clear that it was restricting the statute to *commercial* efforts to purvey pornography, and then only to purveyors who *knowingly* violated the law or who failed to take *reasonable steps* when aware that the law was being violated. It also provided immunity to Internet Service Providers. *See* 2000 Va. Acts ch. 1009 (now codified in Va. Code Ann. § 18.2-391(A)(2)).

If this narrowly tailored statute does not survive strict scrutiny, then the conclusion must be drawn that States have no alternative but to abandon efforts to regulate Internet-based pornography deemed harmful to juveniles. Yet, the Supreme Court is not prepared to accept this conclusion, nor is Virginia. To the contrary, the Supreme Court has observed that with the appropriate technology, zones of adult material can be created on the Internet as an appropriate form of regulation. *See, e.g., Ashcroft*, 535 U.S. at 583 & n.14; *Reno v. ACLU*, 521 U.S. at 886-91 (O'Connor, J., concurring in the judgment in part and dissenting in part).

Commercial websites distributing pornography on the Internet now make use of technology that can be applied to comport with Virginia's statutory requirements. They display free clips of their material as "teasers" to entice the viewer to enter their adult zone and purchase a complete viewing of this material. To enter the zone, however, the viewer must provide credit and adult verification. Moreover, as Virginia demonstrated and the district court accepted, the fact that age verification measures are now available and are being used with minimal burden on e-commerce, it is difficult to conceive how these website purveyors should complain when Virginia suggests that these mechanisms could be employed to satisfy § 18.2-391. Conceptually, pornographic websites today operate adult "e-bookstores" into which they invite all adults, and they are controlling access to their adult zones of cyberspace. This is hardly different from the "real-space" circumstances of a bookseller selling pornography.

I would reverse the judgment of the district court and uphold the constitutionality of the statute. I therefore respectfully dissent.